James Edward SMITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 69285.

Court of Criminal Appeals of Texas, En Banc.

Nov. 12, 1987.

---

Randy McDonald, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Winston E. Cochran, Jr., Roberto Gutierrez and Keno Henderson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Judge.

Appellant was convicted of the offense of capital murder. Punishment was assessed at death.

In his first point of error, appellant contends that the evidence is insufficient to support the jury's finding that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.

A review of the record reveals that appellant was charged with killing Larry Don Rohus, the district manager for Union Life Insurance Company during the robbery of the company's offices. Debra Rene Wilson, the only eyewitness to the offense, testified that she and Rohus were alone in the outer office of the company at approximately 1:00 p.m. on March 7, 1983. As she was counting money in the cash drawer, she heard the sliding glass window being pulled open. Looking up, she saw a man standing outside the window, wearing a stocking mask over his head. The man, who was pointing a gun at her, cocked the gun and told her to give him all of the money. Wilson related that she instantly panicked and ran behind a filing cabinet. Rohus, who was sitting at a secretary's desk turned to Wilson and told her to give him the money. When Wilson did not move from behind the filing cabinet, Rohus got up and went to the cash drawer. He removed some of the money and holding it in his hand went back towards the window. The gunman told him to put it into a container so Rohus emptied a small trash can

that was lined with a plastic bag and put the money inside. He then placed the can on a table near the gunman and began walking towards Wilson. Before he could reach the filing cabinet, however, the gunman instructed Rohus to return to the window. Rohus turned around and began pleading with the gunman not to shoot him. The gunman then said something to Rohus which Wilson was unable to hear. As Rohus began fumbling with his wrist as if to take off his diamond identification bracelet, a gunshot rang out. Rohus began running back towards Wilson and the gunman fired a second shot. After the second shot, Rohus fell to the floor mortally wounded. Medical testimony showed that Rohus died of one gunshot wound to the upper left side of the chest.

Jose Montalvo, a supervisor with Union National Life Insurance Company, testified that he was in his office when he heard gunshots and screams coming from the cashiers office. Montalvo related that he came out of his office just in time to see appellant, who was holding a gun, back away from the sliding glass window. Montalvo followed appellant out of the office and downstairs. There he was joined in the pursuit by a businessman named Robert Lawson. Montalvo and Lawson pursued appellant outside, across a vacant lot and into an apartment complex. A group of workmen working on the apartment complex also joined in the pursuit and appellant was apprehended and disarmed near the complex. Montalvo testified that while he was chasing appellant through the apartment complex, he saw appellant turn around at one point and aim his gun at him. Montalvo testified that he ducked behind a corner of the building. Then he heard gunfire. When he looked around the corner he saw that Javier Ramos and the rest of the workmen had appellant down on the ground and were struggling with him. Lawson, the businessman who joined in the chase, testified that he saw appellant turn and aim his gun at both him and Montalvo while they were chasing appellant across the vacant lot.

Javier Ramos, the foreman of the crew working on the apartment complex, testi-fied that he and his men joined in the pursuit after Montalvo called for help. One of his men, Rafael Gutierrez, was the first one to catch up with appellant. When Gutierrez grabbed appellant, appellant aimed his gun at Gutierrez's chest. Ramos testified that he heard the gun click twice. Appellant then turned and pointed his gun at Ramos. Ramos related that he told Gutierrez to knock appellant down. Gutierrez came up behind appellant and grabbed him and then the three men began struggling. During this time appellant was trying to knock Gutierrez down with the gun. Ramos grabbed the gun to keep appellant from hitting Gutierrez with it. During this struggle, appellant pulled the trigger of the gun again and this time the gun fired, with the bullet passing between Ramos' legs. When appellant attempted to pull the trigger again, Ramos put his hand in the way of the hammer so that when appellant pulled the trigger, the hammer hit the web of the skin between Ramos' thumb and forefinger. Appellant was eventually wrestled to the ground and released his grip on the gun only after Ramos bit him in the hand.

Further evidence at the guilt-innocence phase of the trial showed that during the late afternoon of February 3, 1984, while the voir dire examination of the jury in the instant case was being conducted, appellant suddenly jumped up from his chair at the counsel table and ran from the courtroom. Deputy Sheriff J. L. Byford and an assistant district attorney pursued appellant down one flight of stairs and out of the annex court building. The two men pursued appellant for approximately four blocks before they lost sight of him. Meanwhile two Houston bondsmen were driving down the busy city street when they spotted Deputy Byford pursuing appellant. They lost sight of appellant for awhile, but spotted him shortly thereafter exiting from the passenger's side of a van which was stopped at a red light. One of the bondsmen gave chase. A Houston police officer who was directing traffic nearby also joined in and eventually tackled and apprehended appellant. Marilyn Grigsby,

the driver of the van, testified that she was stopped at a red light when the appellant ran in front of her van and around to the passenger's side and got in. He asked her to give him a ride. Grigsby testified that she was frightened and after going one block in the stop and go traffic, she asked appellant to get out. He did so. Subsequently Grigsby saw appellant apprehended by the Houston police officer.

The only evidence presented at the punishment stage of the trial by the State consisted of the testimony of Deputy Sheriff Neil Picquet. Picquet testified that on January 17, 1984, he went to the basement holdover cell to escort appellant to the third floor of the Harris County Courts building. Appellant refused to allow Picquet to handcuff his hands behind his back. After Picquet forcibly handcuffed appellant, he asked appellant what he was charged with and what his name was. Appellant replied that he was charged with capital murder. Then appellant remarked "I kill people like you." Appellant repeated this remark as they were riding up in the elevator. When they reached the third floor of the building, Picquet informed his supervisor of appellant's conduct and threats. Picquet then told appellant that an incident report would be filed against him, and appellant replied, "Fuck you."

Appellant took the stand during the punishment stage of the trial and testified that he was thirty-one years old at the time of the trial, that he was one of twelve children and that his parents had divorced when he was very young. He related that he had left home when he was fifteen and had traveled extensively throughout the world. Appellant further testified that he served in the United States Navy from March, 1972, until June 7, 1975, when he was given a dishonorable discharge because he had struck an officer. Finally appellant testified that he had no prior criminal convictions.

In determining questions regarding sufficiency of the evidence, it is our duty to review the evidence in the light most favorable to the jury's findings. *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987);

*Santana v. State,* 714 S.W.2d 1 (Tex.Cr. App.1986). Furthermore, it is often the case that the circumstances of the offense can alone sustain an affirmative answer to the second special issue. *Moreno v. State,* 721 S.W.2d 295 (Tex.Cr.App.1986); *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr. App.1979).

■ Appellant argues and we agree that the circumstances of the instant offense alone are not sufficient to support the jury's affirmative answer. As we stated in *Roney v. State,* 632 S.W.2d 598 (Tex.Cr. App.1982),

"Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State,* 591 S.W.2d 464, 480 [Tex.Cr. App.1979], where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition." 632 S.W.2d at 603 [citations omitted and emphasis in original]

In this case, however, unlike in *Roney,* other evidence was introduced to show appellant's propensity for violence. Certainly appellant's own testimony concerning his discharge from the Navy reflects on his tendency to commit violence. So also does the testimony of Deputy Sheriff Picquet. Finally, looking to the actions of appellant

during his attempt to escape from his pursuers immediately after the commission of the offense, it is clear that had appellant not been restrained, certainly he would have been responsible for another shooting. Viewing the evidence in the light most favorable to the verdict, we are constrained to find that the evidence supports the jury's verdict. (Contrast *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987) where we held the evidence insufficient to support the affirmative answer to the second special issue.) Appellant's first point of error is overruled.

In the next three points of error, appellant argues that prospective juror's Gene McCulloch, Tommie Allen and Harvey Roxland were excused in violation of the doctrine announced in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Before we discuss the merits of appellant's arguments, we need to review the standard to be used in determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. As noted above, appellant bases his argument in part on the standard enunciated by the United States Supreme Court's opinion in *Witherspoon*. However, in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court clarified the standard:

> "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon's* reference to 'automatic' decision making, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will

react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror." 105 S.Ct. at 852. (footnotes omitted)

Prospective venireman Gene McColloch testified initially in answer to questions by the trial court that he was conscientiously opposed to the death penalty and regardless of the facts of a case would automatically exclude considering death as a possible penalty. McColloch also stressed in answer to the judge's questions that he could not take an oath that as a juror in a capital murder case he would render a true verdict according to the evidence and the law. During questioning by the State, McColloch strongly reiterated these views. The main thrust of questioning by appellant's attorney took the form of a hypothetical situation: assuming that McColloch was serving on a jury and had taken the oath to render a true verdict according to the evidence and the law, would McColloch answer one of the issues in the negative if the evidence justified an affirmative answer. McColloch replied that assuming he took the oath, he would have to follow it. After the conclusion of the defense voir dire examination, the State renewed their challenge for cause. Before ruling on the challenge, the trial court asked McColloch the following:

> "THE COURT: Mr. McCulloch, again, would you take an oath to follow the law that would require a juror, if they were satisfied beyond a reasonable doubt, to return a verdict that would cause the judge to impose death as a punishment?

> "THE JUROR: No, sir, not that particular oath, I couldn't.

"THE COURT: You cannot take such an oath?

"THE JUROR: No, sir.

"THE COURT: You cannot follow that part of our law?

"THE JUROR: No, sir.

"THE COURT: Under any circumstances?

"THE JUROR: Under any circumstances."

The court then sustained the State's challenge for cause over appellant's objection.

Under *Wainwright*, a juror who will ultimately be guided by his or her personal beliefs rather than the law is not qualified to sit on a jury in the State of Texas. *Landry v. State*, 706 S.W.2d 105 (Tex.Cr. App.1985). Clearly McCulloch was such a juror. He repeatedly stated that because of his personal beliefs he could not take the oath mandated by Article 35.22, V.A.C.C.P., and thereby render a verdict solely based on the evidence and the law. The trial court acted properly in excusing McCulloch for cause. Appellant's second point of error is overruled.

■ Prospective juror Tommie Allen, in response to questioning by the trial court, testified that because of his personal feelings about the death penalty, he would in every case regardless of the evidence refuse to return a verdict that would cause death to be imposed as a punishment. He reaffirmed this answer after the trial judge explained the procedure used in Texas in the punishment phase of a capital murder trial. During questioning by the State, Allen never wavered from this position. During questioning by the defense, it was explained to Allen that as a juror, Allen would have the liberty of defining reasonable doubt in whatever way he desired:

"Q. ... The point is, Mr. Allen, I'm just trying to get you to see the position you would be in if in fact you were asked to pass upon those issues. The point is, you would—one of the basic building blocks I don't think that was explained to you is that whatever a reasonable doubt is is something in the law which will not be defined for you. That is something that each man must decide on his own, that is, whether or not the State has met its burden of proof beyond a reasonable doubt. Do you understand that?

"A. Yes, sir.

...

"Q. ... I assume by what you are telling me that you would be able to sit as a juror and listen to the evidence and make a decision as to whether or not that evidence convinced you, Mr. Allen, beyond a reasonable doubt, whatever that definition might be for you as to whether or not the man, not only did what they said he did in the first instance in finding him guilty but also as to whether or not the answers to certain special issues ought to be yes or no; am I right about that?

"A. Yes, in a way.

"Q. One more time, I didn't hear what you said?

"A. Yes.

"Q. So you understand then the concept of beyond a reasonable doubt and the State's burden of proof in the case, and you would be able to decipher the evidence as a juror, hear the facts in the case and decide whether it convinced you beyond a reasonable doubt that the answers to the questions ought to be yes or no?

"A. Yes, sir.

...

"Q. ... It's true, isn't it, that if you believe beyond a reasonable doubt that the answer to special issue number one ought to be, yes, then you would answer it, yes?

"A. Yes, sir.

"Q. ... It is true, isn't it, that if in fact you had considered all that evidence and if Mr. Allen was convinced that beyond a reasonable doubt there was in fact a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, and I don't know what it would take to convince you of

that and I'm not entitled to conjure up specific sets of facts and circumstances, but the point is, if that evidence was there to you (sic) sufficient to convince you beyond a reasonable doubt that that question ought to be answered, yes, you would answer it, yes?

"A. Yes, I would.

. . .

"Q. Are you telling me then even though you would know what the outcome of your answers would be, if in fact you were convinced for you beyond a reasonable doubt that the answers to certain special issues ought to be answered, yes, that you would then in fact answer them, yes?

"A. Yes, sir."

In an attempt to determine how Allen's answers to the defense questions related to his true feelings about the death penalty, the trial court asked Allen if because of his feelings about the death penalty, would he ever knowingly return a verdict to the court that he knew would cause the death penalty to be imposed. Allen clearly and unequivocally stated that he could never vote for imposition of the death penalty. Thereupon the trial court sustained the State's challenge for cause.

Clearly the voir dire examination of Allen revealed that he had serious personal misgivings about the death penalty. Although in response to defense counsel's questioning Allen testified that he could answer the special issues if his own personal standard of beyond a reasonable doubt was satisfied, he never wavered in his personal opposition to the death penalty. Thus, throughout the entire voir dire examination, it was apparent that the idea of the death penalty would affect Allen in all stages of the decision making process. In Adams v. Texas, supra, the Supreme Court wrote:

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." 448 U.S. at 46, 100 S.Ct. at 2527, 65 L.Ed.2d at 590.

After according due deference to the ruling of the trial judge who saw and heard the juror, we are unable to say that the trial judge abused his discretion in granting the State's challenge. *Bell v. State*, 724 S.W. 2d 780 (Tex.Cr.App.1986). Appellant's third point of error is overruled.

■ Venireman Harvey Roxland originally was questioned by both sides and accepted for jury service. However, two days after he was selected, he telephoned the trial judge and informed him that he was having some reservations about some of the answers he had previously given. Roxland was called back for further voir dire examination over appellant's objection. He made an opening statement in which he testified that he had thought about his answers in regard to the death penalty and was now convinced that he could not be a part of a jury that was asked to consider death as a possible penalty. During voir dire examination by the defense Roxland revealed that he felt he could be fair and impartial on the question of guilt, however he felt he could not be part of a jury considering death because of his personal feelings, newly thought out, about the death penalty. When asked if he would deliberately return a negative answer on a punishment issue if he really thought the answer should be "yes," Roxland testified that he would not lie and give a negative answer but he might not answer the question at all because he would not want to have a part in the imposition of the death penalty. In response to questioning by the State, Roxland testified that the State could never present enough evidence to persuade him to vote in such a way that would cause the imposition of the death penalty. Finally, Roxland testified in response to examination by the trial court that his personal feelings regarding the death penalty were such that he could not

set them aside and follow the law that would permit the death penalty to be imposed. The trial court excused Roxland for cause over appellant's objection.

Appellant now argues that Roxland was improperly excused. Appellant argues that the Supreme Court in *Adams* specifically spoke to this situation when they wrote that a prospective juror should not be excused because the *possible* influence of the death penalty would involve him emotionally or cause him to deliberate upon the issues with greater seriousness than he otherwise would. Appellant argues that Roxland's emotional concern or worry was not equivalent to an unwillingness or an inability to follow the Court's instructions and obey his oath and thus he should not have been excused.

We find that Roxland was properly excused. As we noted above the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, supra. It is obvious from our reading of the record that this was an issue that Roxland had anguished over since his initial voir dire examination. We have no doubt in our minds that Roxland's newly thought out views were so deep that they would have greatly impaired his function as a juror.

Furthermore, we find that this is one situation in which deference to the trial judge's decision is mandated. It is obvious from the record that Roxland's testimony was full of emotion and great conviction. Surely, the trial judge is the better gauge of the depth of such emotion and conviction than we who can only read the printed page. In accordance with *Wainwright*, we defer to the trial judge's decision in excusing the juror. *Bell v. State*, supra; *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985). Appellant's fourth point of error is overruled.

■ In his fifth point of error, appellant argues that the trial court erred in overruling his motion for mistrial when it was clear that the prosecutor intentionally violated the trial court's ruling on the motion to suppress.

During trial Officer J.L. Lindsay of the Houston police department testified that he was dispatched to the scene of appellant's arrest at approximately 1:00 p.m. on the day of the offense. Officer Lindsay testified that he found a taxi cab belonging to the Yellow Cab Company parked in the parking lot of the apartment complex where appellant was arrested. The engine of the cab was running and the keys were in the ignition. (Testimony presented at trial showed that appellant had leased the cab from the Yellow Cab Company.) Just as Officer Lindsay began to testify as to what he viewed when he looked inside the windows of the cab, appellant requested that a hearing be held outside the jury. The court consented and a hearing was had out of the presence of the jury. During the hearing Officer Lindsay testified that when he looked into the cab he saw a pink package lying on the back seat of the cab. The pink package had some hosiery sticking out of it. Other testimony showed that the cab was later towed to the print stall of the Houston police department. There the car was searched without a search warrant. The package on the back seat was identified as a package of "No Nonsense Wide Band Knee Highs". A search of the package revealed that the package contained only one stocking. After hearing this evidence, the trial court ruled that the items themselves which were seized from the cab were inadmissible; however Officer Lindsay would be allowed to testify as to what he saw in plain view from outside the vehicle.

After the judge's ruling the jury was returned and Officer Lindsay resumed his testimony. He testified that when he looked in the windows of the cab, he saw a pink package lying on the back seat of the car. The package was open and Lindsay could see some panty hose protruding from the package. (Eyewitnesses to the offense testified that the robber was wearing a nylon stocking over his head.) On cross-ex-

amination, Lindsay testified that he could not tell how many hose were in the package or how many hose the package originally contained. On redirect the State asked the officer what kind of panty hose were contained in the package. Officer Lindsay then testified that the panty house found in the taxi cab were knee length. Thereafter the State passed the witness to the defense and the judge made inquiry as to whether the defense had any further questions. At that point appellant requested that the jury be removed from the courtroom and after they had been excused, argued that the State had violated the trial court's ruling on the motion to suppress when Officer Lindsay testified as to the type of panty hose. Officer Lindsay was again called to the stand outside the jury's presence and it was established that when he looked in the window of the cab, he was unable to identify the type of hosiery contained in the sack. The jury was called back into the courtroom and the trial court instructed them to disregard the officer's testimony concerning the type of panty hose found in the package. Appellant's motion for mistrial was overruled.

Appellant argues, without citation to any authority, that the prosecutor's intentional disregard of the trial court's order constituted gross misconduct which was calculated to deny appellant a fair trial.

In its reply, the State does not concede error, but argues that if the prosecutor's actions did constitute error, the error was harmless. We agree. The discovery of the hose in the cab only added support to the already plentiful evidence which showed appellant to be the murderer. As shown above, appellant was pursued from the scene of the offense and apprehended a short distance away by his pursuers. When seized, appellant carried the murder weapon and the stolen money. Although appellant tried to make identity an issue, a thorough reading of the record shows that the identification evidence was strong and unimpeached.

The test for harmless error is not whether a conviction could have been had without the improperly admitted evidence but whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Ranson v. State,* 707 S.W.2d 96 (Tex.Cr.App.1986); *Maynard v. State,* 685 S.W.2d 60 (Tex.Cr. App.1985); *Vanderbilt v. State,* 629 S.W. 2d 709 (Tex.Cr.App.1981). Reviewing the entire record we have come to the conclusion "that the 'minds of the average jury' would not have found the State's case *significantly less persuasive* ... had the testimony now at issue been excluded." *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). This point of error is overruled.

■ In his sixth point of error, appellant argues that the court's charge on guilt was fundamentally defective because following the paragraph which applied the law to the lesser included offense of murder, there was no "converse charge." Appellant did not object to the charge at the time of trial.

The application paragraphs of the court's charge on guilt-innocence read as follows:

"7.

Now if you find from the evidence beyond a reasonable doubt that on or about the 7th day of March, 1983, in Harris County, Texas, the defendant, James Edward Smith, did while in the course of committing or attempting to commit the robbery of Larry don Rohus, intentionally cause the death of Larry Don Rohus by shooting the said Larry Don Rohus with a gun, then you will find the defendant guilty of capital murder.

**Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and next consider whether or not the defendant is guilty of the lesser included offense of murder.**

8.

If you find beyond a reasonable doubt that on the occasion in question the defendant did intentionally or knowingly cause the death of Larry Don Rohus by unlawfully shooting him with a gun, but you have a reasonable doubt as to wheth-

er the defendant was then and there engaged in the commission of robbery or attempted robbery of Larry Don Rohus at the time of the said shooting, if any, then you will find the defendant guilty of murder, but not capital murder.

If you find from the evidence beyond a reasonable doubt that on the occasion in question the defendant did knowingly cause the death of Larry Don Rohus by shooting him with a gun, but you have a reasonable doubt as to whether the defendant intentionally killed Larry Don Rohus, as the term 'intentionally' has been defined herein, then you will find the defendant guilty of murder not capital murder, regardless of whether you find from the evidence beyond a reasonable doubt that the defendant was then and there in the course of committing or attempting to commit the offense of robbery of Larry Don Rohus of his property.

### 9.

If you should find from the evidence beyond a reasonable doubt that the defendant is either guilty of capital murder or murder, but you have a reasonable doubt as to which offense he is guilty, then you should resolve that doubt in the defendant's favor, and in such event, you will find the defendant guilty of the lesser offense of murder.

If you have a reasonable doubt as to whether the defendant is guilty of any offense defined in this charge, you will find the defendant not guilty."

Appellant seems to argue that the charge is defective because it did not contain a converse charge after the paragraph applying the law of murder to the facts similar to the bold face converse charge which followed the paragraph applying the law of capital murder to the facts. We find this argument to be totally without merit. A thorough reading of the charge, especially the second paragraph under numeral nine, shows that the jury was properly instructed that they were to find the appellant not guilty if they had a reasonable doubt as to the appellant's guilt of the offense of murder.

Furthermore, even if we assume that the charge as given was erroneous, appellant would still not be entitled to reversal in that the jury found appellant guilty of capital murder and never had occasion to consider the lesser included offense of murder. *Clark v. State*, 717 S.W.2d 910 (Tex.Cr. App.1986); *O'Pry v. State*, 642 S.W.2d 748 (Tex.Cr.App.1982) (Opinion on Rehearing). Thus, applying the standard enunciated in *Almanza v. State*, 686 S.W.2d 157 (Tex.Cr. App.1985), of "egregious harm", reversal is not mandated. Appellant's sixth point of error is overruled.

■ In his last point of error, appellant argues that the trial court violated the spirit of Article 34.04 V.A.C.C.P., by denying two of his pretrial motions. Article 34.04, supra, provides in pertinent part as follows:

"No defendant in a capital case shall be brought to trial until he shall have had at least two days (including holidays) a copy of the names of the persons summoned as veniremen, for the week for which his case is set for trial except where he waives the right or is on bail...."

Prior to trial appellant filed two pretrial motions asking for a modification of Article 34.04, supra. The first asked that he be given the list of prospective jurors five days in advance of trial. The second motion argued that because Harris County was so large and so many prospective jurors were called for jury duty each week, the true purpose of Article 34.04, supra could not be adequately fulfilled by giving a defendant a mere two days to go over the jury list. Therefore he asked that the prospective jurors be summoned to the court for jury duty in groups of thirty per week. Prior to each week, appellant would be given two days to study the information cards from the thirty prospective jurors and thus some purposeful meaning would be given to Article 34.04. The trial court also denied this motion. The record reflects and appellant agrees that the trial court did provide appellant with a weekly prospective juror list two days in advance as provided for by Article 34.04, supra.

The terms of Article 34.04, supra, and its predecessors have been construed to be mandatory so that an accused may be assured of the opportunity to examine the prospective juror list prior to the voir dire examination. *Marshall v. State*, 444 S.W.2d 928 (Tex.Cr.App.1969). Complete failure timely to provide such a list to an accused has been grounds for reversal of the accused's conviction. *Marshall v. State*, supra.

However, in situations where Article 34.04, supra, has been complied with, this Court has found no error when an accused has requested additional time in which to examine the jury list. In *Solis v. State*, 492 S.W.2d 561 (Tex.Cr.App.1973), Solis' counsel was, in accordance with Article 34.04, supra, provided with a list of all veniremen summoned for the week in Bexar County. The list contained 740 names. When Solis' counsel requested an additional forty-eight hours in order to investigate the background of the jury, the court denied the request. This ruling was upheld on appeal with this Court holding that Solis was not denied "fair notice."

While we may agree with appellant that the two day period for examination of juror lists enunciated in Article 34.04, supra, provides little opportunity in urban counties for investigation of prospective jurors, we must find that the trial court did comply with the letter of the article. This Court is not the legislature. Our duty is to read and apply the law, not write it. Until the legislature deems it necessary to amend Article 34.04, supra, and provide some meaningful review of jury lists for defendants in urban counties, two days notice, as was given in the instant case must suffice.

Although appellant in the title to his point of error invokes the Fourth, Fifth and Sixth Amendments to the United States Constitution in addition to Article 34.04, supra, he makes no argument concerning these constitutional provisions. Our examination of the record reveals no violation of either appellant's due process rights or right to effective counsel. Appellant has not demonstrated in any way that he was actually harmed. As the State points out in their brief, the veniremen were drawn out of the large pool of jurors in groups of six. Each prospective juror was given an information form by the court in addition to the normal juror information form to fill out and these were furnished to the attorneys for both sides. The docket sheet reflects that the first group of six was drawn on January 9, 1984, the next group of six was drawn on January 11, 1984. On January 13, 1984, three more jurors were drawn from the pool. The process continued in this manner until the voir dire examination was completed. Appellant has not furnished this Court with the name of any venireman whose background he alleges he was not allowed to sufficiently investigate or examine. Consequently, we find no violation of appellant's due process rights or his right to effective assistance of counsel. This point of error is overruled.

Having found no reversible error, we affirm the conviction.

CLINTON and TEAGUE, JJ., dissent to overruling the first point of error. See *Beltran v. State*, 728 S.W.2d 382, at 390 (Tex.Cr.App.1987).