**Dionicio Vega GARZA, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–97–573–CR.**

Court of Appeals of Texas,
Fort Worth.

Feb. 25, 1999.

Rehearing Overruled April 1, 1999.

---

Law Office of William H. "Bill" Ray, P.C., William H. "Bill" Ray, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Assistant Criminal District Attorney, Michael R. Casillas, Assistant Criminal District Attorney, Barbara Medley, Assistant Criminal District Attorney, Fort Worth, for Appellee.

Before LIVINGSTON, DAUPHINOT and HOLMAN, JJ.

## OPINION

DIXON W. HOLMAN, Justice. .

Appellant Dionicio Vega Garza was charged with a non-capital felony offense. On the day set for trial, a venire was brought to the courtroom and seated so each veniremember could write answers to questions asked in a written questionnaire. Both the prosecutor and the defense attorney were present, observing the veniremembers while they completed their task. At 11:00 a.m., the questionnaires were answered, and the court immediately recessed for lunch. During the recess, both the prosecutor and the defense attorney reviewed the completed questionnaires in order to read the biographical and other information the veniremembers had provided about themselves. Court reconvened after lunch and, because of information seen in the veniremembers' written answers, the State asked for a jury shuffle. *See* TEX. CODE CRIM. PROC. ANN. art. 35.11 (Vernon Supp.1999). Procedurally, both a defendant and the State have an equal opportunity to shuffle the venire. *See id.* The State's request was granted over Appellant's objection that relied upon and cited the trial court to the holding of *Davis v. State,* 782 S.W.2d 211, 214 (Tex.Crim.App.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990). Complaints of jury shuffle error must be preserved for appellate review, and Appellant's complaint about the shuffle was preserved when the trial court overruled his objection. *See Johnson v. State,* 977 S.W.2d 137, 139 (Tex.Crim.App.1998).

Appellant presents nine issues on appeal, but because the first issue is dispositive, we will not address the others. We will reverse and remand for a new trial.

### The Issue

■ The issue is whether a party may evaluate the information gleaned from juror information cards or biographical questionnaires before deciding whether to request a shuffle of the venire. The Court of Criminal Appeals has said no. *See Davis,* 782 S.W.2d at 214. In both capital and non-capital offense cases, the Court of Criminal Appeals has stressed that a motion to shuffle the venire will not be granted unless timely made. *Compare id.* (a capital offense case) *with Alexander v. State,* 523 S.W.2d 720, 721–22 (Tex.Crim.App.1975) (a non-capital felony offense case). In either type of case, a motion to shuffle is untimely and will be denied if the movant delays the motion until after the voir dire starts. *See Davis,* 782 S.W.2d at 214; *Alexander,* 523 S.W.2d at 721. In a non-capital case, the voir dire

starts when the State begins examining the venire. *See Williams v. State,* 719 S.W.2d 573, 575 (Tex.Crim.App.1986). In a capital case, the voir dire starts when the trial judge begins examining the venire as prescribed in article 35.17 of the Texas Code of Criminal Procedure. *See Davis,* 782 S.W.2d at 215.

▪ Here, Appellant argues that the State's motion to shuffle should have been denied because it was made after voir dire had started in his non-capital felony case. The record reflects that when the motion was made, the State's examination of venire-members on voir dire had not started. The State made its motion after the venire had been seated in the presence of counsel for Appellant and the State, after the venire-members had written their answers to the questionnaires, and after the parties' lawyers had reviewed that written information during the lunch recess.

There is precedent for arguing, as the State does, that none of those events trigger the start of voir dire in a non-capital case. In 1975, the Court of Criminal Appeals established that the seating of a venire in a non-capital case does not start the voir dire. *See Alexander,* 523 S.W.2d at 721–22. In 1982, a court of appeals determined that the voir dire in a non-capital case does not begin when the attorneys review the juror information cards. *See Holman v. State,* 636 S.W.2d 18, 18–19 (Tex.App.—Dallas 1982, pet. ref'd). In 1986, the Court of Criminal Appeals held that in a non-capital case, voir dire does not begin until "the State is recognized by the court to commence the voir dire examination and actually starts that examination." *Williams,* 719 S.W.2d at 577. In 1987, the Court of Criminal Appeals determined that the voir dire does not begin in a non-capital case just because the prosecutor tells the court, on the record, that he is *ready* to start the voir dire. *See DeLeon v. State,* 731 S.W.2d 948, 949 (Tex.Crim.App.1987). Then came the 1989 Court of Criminal Appeals holding in *Davis.*

Because of *Davis,* the determination of "timeliness" in connection with Appellant's first issue involves more than the basic inquiry of whether or when the voir dire started. The crux of Appellant's issue is whether a shuffle motion is untimely if it is made after the movant has read and evaluated the veniremembers' personal information, furnished by them in writing at the court's request. In addition to addressing *when* a voir dire starts, *Davis* emphasizes, making no distinction between capital and non-capital cases, that a party contemplating whether to ask for a shuffle of the venire under article 35.11 is only entitled to *see* its members before making the motion. *Davis,* 782 S.W.2d at 214.

For the purposes of a motion to shuffle, article 35.11 does not *require* a trial court to provide access to any personal information about the veniremembers. *See id.* ("We have never interpreted [article 35.11] as requiring the trial court to afford the defendant anything more than being able to view the outward appearance of the venire members."). Based only on their outward appearance, a party may have one set of veniremembers discarded and another set summoned, using the mechanism of article 35.11. The article gives parties an ability to trade one proverbial "pig-in-a-poke" for another at a stage of the trial when neither party has the advantage of knowing any more about the potential jurors than their outward appearance. *Alexander,* decided by the Court of Criminal Appeals in 1975, noted that the Legislature did not intend for article 35.11 to enable parties to elect a venire shuffle based upon information elicited during the voir dire. *Alexander,* 523 S.W.2d at 721. The court also stated that "[t]o allow either party to request a shuffle of the names of the jury panel after voir dire begins would be disruptive and unduly prolong the trial." *Id.* But, eleven years later, while adhering to the requirement that a motion to shuffle the venire must be made before the voir dire starts, the Court of Criminal Appeals also observed that "[t]he right of trial by jury stands *on a higher plane than expediency* [and a] shuffle of the jury panel for the case actually takes a minimal amount of time if properly handled." *Williams,* 719 S.W.2d at 577 n. 5 (emphasis added). In 1993, the Court of Criminal Appeals again scorned "expediency" as a measure in evaluating the propriety of a motion to shuffle the venire.

*Chappell v. State,* 850 S.W.2d 508, 513 (Tex. Crim.App.1993) ("The right of trial by jury stands on a higher plane than expediency; and fair trial by jury means a jury selected according to the law regulating their selection and empanelment.") (quoting *Fontenot v. State,* 379 S.W.2d 334, 335 (Tex.Crim.App. 1964)).

When the venire shuffle issue in *Davis* came before the Court of Criminal Appeals, the court characterized it this way:

> Appellant ... asserts that he was entitled to review the juror information cards and his questionnaires [biographical information] before he exercised his option to have the names shuffled. We disagree.

*Davis,* 782 S.W.2d at 213. *Davis* states plainly and simply why parties desiring a venire shuffle must ask for it based only on the outward appearance of the veniremembers:

> [I]t was not the intent of the Legislature [in article 35.11] to have the names of the venire shuffled based upon information obtained during voir dire....

*See id* at 214.

So too, *Davis* denies parties the use of information gleaned from juror information cards or biographical questionnaires as a basis for a motion to shuffle. *Id.* Significantly, in addressing the use of that source for information, *Davis* makes no distinction between capital and non-capital cases. *Id.* And, with respect to the use of juror cards and questionnaires as the basis for a shuffle, *Davis* makes a denial of the motion dependent upon the *source* of the information, the cards and questionnaires, not just dependent upon whether the voir dire has started. *Id.* Consequently, the *timing* of a motion to shuffle is still critical to the motion's success, but for a trial court that is determining the viability of the motion, *Davis* makes pinpointing *when* the voir dire starts a consideration that is separate from the principle that forbids using the veniremembers' written personal information as a basis for a motion to shuffle. *Id.*

Otherwise, *Davis* would stand for an untenable proposition: that although a venire shuffle must be premised only upon a *view* of the venire and therefore will be denied if based upon information verbally obtained during voir dire, the motion to shuffle will be granted if based upon identical information gleaned before voir dire from the veniremembers' own writings. That proposition is neither stated nor implied in *Davis.* Instead, a party who decides to make a shuffle motion *either* because of veniremembers' verbal answers during voir dire *or* because of reviewing the personal information they have written about themselves, has taken the shuffle procedure well past the premise that a shuffle must be based merely upon the veniremembers' outward appearance. *See id.*

Focusing on that rationale, the Court of Criminal Appeals held:

> Following *Alexander,* [a non-capital offense case] we hold that because it was not the intent of the Legislature to have the names of the venire shuffled based upon information obtained during voir dire, *so too* it was not the intent of the Legislature [in article 35.11] to base the shuffle on information gleaned from juror information cards and/or biographical questionnaires.

*Id.* (emphasis added). Plainly, this holding is the antithesis of the court of appeals holding in *Holman,* seven years earlier. *See Holman,* 636 S.W.2d at 19.

In Appellant's case, the prosecutor conceded that he relied on information gleaned from the questionnaires in deciding to ask for a shuffle. The lunch recess, during which the prosecutor reviewed the information the jurors had written, lasted more than an hour. *Davis* even addresses a significantly similar circumstance and rejects that length of time as incompatible with article 35.11:

> Moreover ... counsel requested an hour to review the veniremen's biographical information before he opted to shuffle their names. [Article 35.11] cannot be read to allow such....

*Davis,* 782 S.W.2d at 214.

*Davis* establishes that when a party is contemplating whether to request a jury shuffle, a trial court is not *required* to furnish any information about veniremembers be-

yond letting the party look at their outward appearance. *Id. Davis* also establishes the unmistakable principle that in a criminal court trial, regardless of whether for a capital offense or for a non-capital offense, the trial court is not *permitted* by article 35.11 to let the parties evaluate the information gleaned from juror information cards or biographical questionnaires before deciding whether to request a venire shuffle. *Id.*

Accordingly, to be timely, a motion to shuffle must be made before the voir dire begins, *and* also made before the movant has reviewed the juror information cards or biographical questionnaires. *See id.* This principle applies to the trials of non-capital as well as capital cases. We conclude that the trial court erred by granting the State's motion to shuffle the venire.

### Harm Analysis

Having found error, we will analyze its effect to determine whether the court's judgment is reversible:

> (a) *Constitutional Error.* If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.
>
> (b) *Other Errors.* Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

TEX.R.APP. P. 44.2.

■ This court recently concluded that the rules governing jury shuffles have no constitutional origin and are purely a creation of the legislature. *See Ford v. State,* 977 S.W.2d 824, 826 (Tex.App.—Fort Worth 1998, pet. filed). Because the erroneous granting of a jury shuffle is not a denial of a constitutional right, we must determine whether it affects a substantial right.

■ The Court of Criminal Appeals recently said that a "substantial right" is "affected when the error ha[s] a substantial and injurious effect or influence in determining the jury's verdict." *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997) (citing *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *see Coggeshall v. State,* 961 S.W.2d 639, 643 (Tex.App.—Fort Worth 1998, pet. ref'd). Applying the court's definition from *King* to the context of Rule 44.2(b), the review standard for "other errors" is: any other error, defect, irregularity, or variance that does not have a substantial and injurious effect or influence in determining the jury's verdict must be disregarded. *See* TEX.R.APP. P. 44.2(b); *King,* 953 S.W.2d at 271.

In *Ford,* we relied on *King*'s definition of "substantial right" in conducting a "reversible-error" harm analysis of a trial court's denial of a timely request for a jury shuffle. *Ford,* 977 S.W.2d at 827. We held that the term "substantial right" included certain statutory rights made mandatory by the Legislature, such as a right to a jury shuffle pursuant to article 35.11. *Id.* We concluded that it is impossible to determine whether an error that occurs before the jury is even empaneled affects that jury's verdict and that "because we cannot measure whether [the jury shuffle] error had a substantial or injurious effect on the jury's verdict, we cannot disregard the error as harmless." *Id.* at 829. To do so would effectively make article 35.11 usable only at a trial court's discretion.

The Court of Criminal Appeals recently addressed the application of the harm analysis to errors regarding jury shuffles. *See Roberts v. State,* 978 S.W.2d 580, 580 (Tex. Crim.App.1998). In *Roberts,* the trial court erroneously granted the State's request for a jury shuffle after the voir dire ended. *Id.* In an unpublished opinion, the court of appeals had reversed Roberts' conviction without conducting a harm analysis. *Id.* The Court of Criminal Appeals held that jury shuffle errors are not exempt from a harm analysis, explaining:

> Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error . . . is categorically immune to a harmless error analysis. Of course, where the error involved defies analysis by harmless error standards or the data is insufficient to

conduct a meaningful harmless error analysis, then the error will not be proven harmless beyond a reasonable doubt under [former] Rule 81(b)(2) [now Rule 44.2]. *Id.* (quoting *Cain v. State,* 947 S.W.2d 262, 262 (Tex.Crim.App.1997)). The Court of Criminal Appeals noted that the court of appeals handed down its decision on August 29, 1997, two days before the new rules of appellate procedure took effect and before the Court's opinion in *Cain* was handed down, and remanded the case back to the court of appeals to determine, in light of *Cain* and Rule 44.2(b), whether the jury shuffle error was amenable to a harm analysis, and if so, whether any harm occurred. *Id.*

In *Cain,* the trial court failed to admonish the defendant of the deportation consequences of a guilty plea. *Cain,* 947 S.W.2d at 263. The Court of Criminal Appeals applied the harm analysis provided in former Rule 81(b)(2), which mandated reversal of all criminal cases in which the record revealed an error "unless the appellate court determine[d] beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment." TEX.R.APP. P. 81(b)(2) (Vernon 1997, revised 1997). In applying former Rule 81(b)(2), the court explained that reversal is required *unless* the error can be shown harmless beyond a reasonable doubt and where the error is not subject to a harm analysis, it can never be proven harmless beyond a reasonable doubt. The Court concluded that "it may be true that some kinds of errors ... will never be harmless under the Rule 81(b)(2) test." *See Cain,* 947 S.W.2d at 264.

■ The new rules of appellate procedure, which took effect on September 1, 1997, created two separate harm analyses for errors in criminal cases. *See* TEX.R.APP. P. 44.2. Under Rule 44.2(a), constitutional error must be reversed *unless* the error can be shown or determined to be harmless beyond a reasonable doubt. That rule creates a presumption that the error is harmful, and thus reversible, unless the presumption is rebutted. The logic of *Cain* is that if the error is not subject to a harm analysis, a presumption of harmful error prevails because the presumption cannot be rebutted. However, Rule 44.2(b) does not create any sort of presumption. Rule 44.2(b) merely requires the appellate court to ignore a non-constitutional error that does not affect a substantial right. A determination must be made as to whether a non-constitutional error does or does not affect a substantial right. Therefore, where a Rule 44.2(b) error does not lend itself to this type of a harm analysis, i.e., determining whether a substantial right was affected, neither logic nor *Cain* requires us to simply disregard the error.

■ A defendant's right to a jury selected and empaneled according to the procedural rules and safeguards promulgated by the Legislature is a substantial right. *See Chappell,* 850 S.W.2d at 513 ("The right of trial by jury stands on a higher plane than expediency; and *fair trial by jury means a jury selected according to the law regulating their selection and empanelment.*"); *see also Williams,* 719 S.W.2d at 577 n. 5. And, where the error violates a substantial right and occurs *before* the formation of the jury, the effect of the error is immeasurable. *See Ford,* 977 S.W.2d at 827 ("Determining whether an error had a substantial and injurious effect on a verdict is normally a difficult task for a reviewing court, but when, as here, the error concerns the formation of the jury itself, as opposed to error occurring in the presence of the jury, it is next to impossible to measure the harm from the fact of the record."). To disregard a jury shuffle error under Rule 44.2(b) simply because an appellant is unable to show that the error affected the jury's verdict, would leave to a trial court's discretion the rule governing a jury shuffle. That would ignore the legislature's prerogative to promulgate procedural rules for fairness in empaneling a jury. *See Carranza v. State,* 980 S.W.2d 653, 657 (Tex. Crim.App.1998). To allow an erroneous jury shuffle based upon information obtained from the voir dire's juror information sheets "affects a substantial right" to a fair and random jury selection. Accordingly, we conclude that the error was harmful to Appellant and that the trial court's judgment should be reversed. *See* TEX.R.APP. P. 44.2(b).

### Conclusion

We reverse the judgment and remand the case to the trial court for a new trial.

DAUPHINOT, J. filed a dissenting opinion.

LEE ANN DAUPHINOT, Justice, dissenting.

I respectfully dissent to the majority's conclusion that voir dire begins when the lawyers read the jury questionnaires, and that a request for a jury shuffle after reading the questionnaires comes after voir dire has begun and therefore is untimely.

### SUMMARY

(1) Article 35.11 provides an absolute right to timely shuffle the jury panel.

(2) This right inures to either the State or the defendant.

(3) A demand to shuffle is timely if made before voir dire begins.

(4) In a non-death penalty case, voir dire begins when the prosecutor is called on and begins to speak.

(5) There is no authority for the position that non-death penalty voir dire begins when either side views the answers to juror questionnaires.

(6) The trial court properly granted the State's demand for a shuffle.

### WHEN DOES VOIR DIRE IN A NON-CAPITAL CASE BEGIN?

The sole issue before us is when voir dire begins in a non-capital case for the purpose of cutting off the right to demand a jury shuffle.[1] As both the code of criminal procedure and case law make clear, the rules differ depending on whether the case is a capital case or a non-capital case.

The majority relies on *Davis v. State*.[2] *Davis* is distinguishable from the case now before us because *Davis* involves the appeal of a death-penalty case. The case now before us does not. The court of criminal appeals even made this distinction in *Davis*. As Presiding Judge McCormick pointed out, when voir dire begins in a capital case is set out in article 35.17 of the code of criminal procedure, which reads:

1. When the court in its discretion so directs, except as provided in Section 2, the state and defendant shall conduct the voir dire examination of prospective jurors in the presence of the entire panel.

2. In a capital felony case in which the State seeks the death penalty, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court.[3]

Thus, article 35.17 contemplates that:

the judge in a capital case (unlike the judge in a non-capital case) is authorized to propound questions concerning "principles as applicable to the case on trial." *In a capital case, where the venire has been seated in the order they will be examined and the defendant has been afforded an opportunity to request a shuffle, the voir dire commences when the trial judge begins his examination of the panel.*

In the case before us, appellant presented his motion to shuffle the names of the venire not only after the trial court had conducted the initial examination per Article 35.17(2), but also after some of the members had been dismissed from service due to pretrial publicity and the remaining venire had been excused from the courtroom with specific instructions of when

---

**1.** *See* Tex.Code Crim. Proc. Ann. art. 35.11 (Vernon Supp.1999).

**2.** 782 S.W.2d 211 (Tex.Crim.App.1989), *cert. denied,* 495 U.S. 940, 110 S.Ct. 2193, 109 L.Ed.2d 520 (1990).

**3.** Tex.Code Crim. Proc. Ann. art. 35.17 (Vernon 1989 & Supp.1999); *see also Davis,* 782 S.W.2d at 215.

each member was to return for individual examination. Appellant's motion was therefore untimely and the trial court properly overruled it. . . . [4]

Voir dire in a non-capital case, however, does not commence when the judge begins his remarks. The question before us is, "When does voir dire begin in a non-capital case?" Fortunately, the court of criminal appeals has directly addressed this issue. In his concurring opinion in *Yanez v. State,* Judge Clinton stated that, "I would hold that voir dire examination commences when counsel for the State is recognized by the judge of the trial court for the purpose of addressing a panel of prospective jurors whose qualifications have been tested satisfactorily in accordance" with the provisions of the code of criminal procedure.[5]

The court of criminal appeals later unanimously adopted Judge Clinton's concurring opinion, stating:

> As earlier noted, Article 35.11, supra, is silent as to when the demand or motion to shuffle must be presented. Judicial decisions have made clear that the demand should be urged before voir dire examination begins. Today we adopt and add to Judge Clinton's concurring opinion in *Yanez.* After the jurors have been qualified, and after the trial court has made its introductory or preliminary remarks, etc., to the jury panel for the case, we hold that the voir dire examination for the purpose of Article 35.11, supra, begins when the State is recognized by the court to commence the voir dire examination and actually starts that examination.
>
> If it was held otherwise, then any judge, by interspersing voir dire type questions among introductory remarks to the jury panel for the cause, could sua sponte deny a defendant his absolute right to a jury shuffle upon timely motion and render a mandatory statute meaningless. . . . [6]

The law is clear, then, that (1) voir dire examination for the purpose of article 35.11 begins in a capital case when the judge begins voir dire of the panel, seated in the order they will be examined, and after affording the opportunity to demand a shuffle; and (2) voir dire examination for the purpose of article 35.11 begins in a non-capital case only when the State is recognized by the court to start its voir dire examination and actually starts the examination.

## DOES THE TRIAL JUDGE'S DECISION TO ALLOW VIEWING OF

## JUROR QUESTIONNAIRES AFFECT WHEN VOIR DIRE

## BEGINS FOR THE PURPOSE OF ARTICLE 35.11?

The majority appears to hold that because there is no absolute right to view juror questionnaires before deciding whether to demand a shuffle, viewing the questionnaires cuts off the right to demand a shuffle. The majority concludes that *Davis* establishes the "unmistakable principle" that a trial court is not permitted "to let the parties evaluate the information gleaned from juror information cards or biographical questionnaires before deciding whether to request a venire shuffle." [7] I respectfully suggest that this rule can hardly be unmistakable when the majority declares that a great number of trial judges, the entire 1982 Dallas Court of Appeals, and I are mistaken in our interpretation of article 35.11.[8]

The majority relies on *Davis* to support its position that a party must demand a shuffle not only before voir dire begins but also before viewing juror questionnaires. The majority believes that the *Davis* court changed existing law when it stated:

> Following *Alexander,* we hold that because it was not the intent of the Legislature to have the names of the venire shuffled

---

4. *Davis,* 782 S.W.2d at 215 (emphasis added).

5. *Yanez v. State,* 677 S.W.2d 62, 71 (Tex.Crim. App.1984) (Clinton, J., concurring).

6. *Williams v. State,* 719 S.W.2d 573, 577 (Tex. Crim.App.1986) (emphasis added).

7. Majority op. at 356.

8. If I were the only one mistaken, then I would not quarrel with the majority's statement.

based upon information obtained during voir dire, so too it was not the intent of the Legislature to base the shuffle on information gleaned from juror information cards and/or biographical questionnaires.[9]

The majority concludes, "Plainly, this holding is the antithesis of the court of appeals holding in *Holman,* seven years earlier." [10] I cannot agree.

The court of criminal appeals in *Davis* dealt only with the issue of whether the trial judge was *required* to allow the defendant to review the juror information cards and his questionnaires before deciding whether to demand a shuffle. The court held that the trial court was not *required* to allow the defendant to view the juror information prior to requesting a shuffle. Having addressed the issue of the defendant's entitlement to the juror information, the court then addressed the separate issue of whether his request for a shuffle was timely based on whether his request was made prior to the commencement of voir dire. If the viewing of juror questionnaires makes a request for a shuffle untimely, then the *Davis'* court's entire discussion of when voir dire begins is unnecessary. Obviously the issue of a defendant's entitlement to juror information and the issue of whether a request to shuffle is timely are two separate and distinct issues.

There is nothing to suggest that the court of criminal appeals in *Davis* intended to change well-established law. If the court of criminal appeals had intended to change existing law in *Davis,* then the court presumably would have mentioned the change in some case in the ten years since *Davis.* I find no such case. Instead I find cases reiterating the generally accepted rule regarding jury shuffles. For example, in 1992, three years after *Davis,* the court of criminal appeals stated, "We have held many times that

a defendant has the absolute right to a shuffle of the jury panel, pursuant to Article 35.11." [11] And in 1993 the court again stated, "A request is timely if made prior to commencement of voir dire." [12] The court did not say that a request is timely if made prior to commencement of voir dire *and prior to viewing the juror questionnaires.*

Additionally, article 34.04 of the code of criminal procedure requires that a defendant in a capital case in which the State seeks the death penalty be provided a copy of the names of the persons summoned as members of the venire.[13] The court of criminal appeals has recognized that this provision allows the defendant to investigate the prospective jurors:

> While we may agree with appellant that the two day period for examination of juror lists enunciated in Article 34.04, supra, provides little opportunity in urban counties for investigation of prospective jurors, we must find that the trial court did comply with the letter of the article. This Court is not the legislature. Our duty is to read and apply the law, not write it. Until the legislature deems it necessary to amend Article 34.04, supra, and provide some meaningful review of jury lists for defendants in urban counties, two days notice, as was given in the instant case must suffice.[14]

This language from a 1991 case directly contradicts the position adopted by the majority in this case.

In felony cases in many large counties, juror questionnaires are filled out in a central jury room or even sent to prospective jurors, who are instructed to bring the completed questionnaire to the central jury room at the juror's first appearance. The questionnaires are copied and distributed to the lawyers before the panel ever arrives at the

**9.** *Davis,* 782 S.W.2d at 214.

**10.** Majority op. at 355.

**11.** *Jones v. State,* 833 S.W.2d 146, 147–48 (Tex. Crim.App.1992) (citing *Williams v. State,* 719 S.W.2d 573, 575 (Tex.Crim.App.1986), *Yanez v. State,* 677 S.W.2d 62 (Tex.Crim.App.1984), and *Sewell v. State,* 696 S.W.2d 559, 560 (Tex.Crim. App.1983)).

**12.** *Ex parte Daigle,* 848 S.W.2d 691, 692 (Tex. Crim.App.1993).

**13.** Tex.Code Crim. Proc. Ann. art. 34.04 (Vernon Supp.1999).

**14.** *Ramirez v. State,* 815 S.W.2d 636, 654 (Tex. Crim.App.1991) (quoting *Smith v. State,* 744 S.W.2d 86, 96 (Tex.Crim.App.1987)).

courtroom. A trial judge may even order the lawyers to examine the questionnaires before the panel is seated in the courtroom. In a non-capital case, panels usually consist of forty-two to sixty prospective jurors. Unless questionnaires are totally meaningless, lawyers must review the questionnaires before they begin their own voir dire.

As a practical matter in these days of crowded criminal dockets and limited budgets, prospective jurors are often sent home from the central jury room after they have completed their questionnaires and instructed that the trial will not begin until the following day. Those persons not chosen for a panel during that first day are dismissed from jury service. This is the one-day, one-trial system adopted by some counties, including Tarrant County. Because a panel may not be chosen until late in the day and because there are usually questionnaire forms to be completed and copied, it is often impractical to attempt to begin voir dire on the day the panel is chosen.

While the trial judge could order the panel from the central jury room to the courtroom for the sole purpose of allowing the lawyers to view the panel seated in order (or even for the purposes of allowing viewing of the panel and also having the panel fill out the questionnaires), to do so means that other court hearings must be suspended, that the defendant must be dressed in street clothes, and that the lawyers must be present to view the panel. If last-minute, pre-trial motions are being heard, there is danger that prospective jurors will inadvertently communicate with a witness or a family member of the defendant or of the complainant. There is also a danger that a prospective juror will wander into the courtroom before the hearing is finished. Because bailiffs must transport prisoners, guard them, and perform a multitude of other duties, a trial judge is often unable to station a bailiff outside the courtroom to guard the forty-two to sixty prospective jurors. Additionally, forty-two to sixty questionnaires cannot be thoroughly reviewed in only a few minutes.

Consequently, prospective jurors often do not come to the courtroom until the day after they have submitted their completed questionnaires. To prohibit a trial judge's ordering the lawyers to examine the juror questionnaires before the panel is seated is an unwarranted intrusion on the discretion of a trial judge to conduct a trial as efficiently as possible while still protecting the rights of all concerned. To force a lawyer to choose between waiving the right to a shuffle and disobeying the trial court's order is fundamentally unfair.

The record before us does not reveal that the trial judge ordered the lawyers to view the questionnaires. But the decision of the majority effectively restricts the trial judge's ability to run his or her own court. If the majority opinion becomes the law of this state, a trial judge who chooses to avoid disrupting his or her docket or tainting the jury panel by requiring the panel to complete the questionnaires in the central jury room has only three choices:

(1) Require the lawyers to review the questionnaires before the panel is seated and thereby avoid wasting the time of the court and the panel, but violate the requirement that the lawyers see the panel seated in proper order before having to decide whether to demand a shuffle; [15]

(2) Call the entire panel into the courtroom for the sole purpose of being stared at by the lawyers or, as in the case before us, for the additional purpose of completing questionnaires, and then have them return hours later for voir dire but withhold the questionnaires from the lawyers until the State actually begins voir dire; or

(3) Call the entire panel into the courtroom, qualify the panel, make his remarks, and then send the panel off for a few hours so the lawyers can review the questionnaires.

If the trial judge chooses the first option, he can conduct voir dire in the morning and hear witnesses in the afternoon. But, ac-

---

**15.** *See Scott v. State,* 805 S.W.2d 612, 614 (Tex. App.—Austin 1991, no pet.) (holding that a defendant has the right to see the jury panel seated in the proper sequence before deciding whether to demand a shuffle. "In fact, the defendant cannot intelligently exercise his right to a shuffle without seeing the panelists seated in the order in which they will be called.").

cording to the majority, he cuts off the right to shuffle the panel. If he chooses the second or third option, he basically adds half a day to the trial. Aside from the added expense, both the second and third options are a waste of both the jurors' and the trial court's time. The majority denigrates the concept of expediency. Expediency does not per se trample the litigants' rights. It may be wholly consistent with protection of the right to a fair trial.

In the case before us, the trial judge chose to bring the panel to the courtroom to fill out the questionnaires. The trial judge then dismissed the panel until after lunch. Both prosecution and defense counsel received copies of the filled-in questionnaires at 11:00 a.m. When defense counsel returned to court at 12:20 p.m., he learned that the State was requesting a shuffle and that the bailiffs were performing the shuffle outside the presence of Appellant.[16] He objected only that because the State had examined the questionnaires, a shuffle was untimely under *Davis*. The trial judge pointed out that *Davis* applies only to capital cases. There is no question that Appellant was provided the questionnaires at the same time as the State.

The questions posed on jury questionnaires traditionally are attributed to the trial court.[17] The purpose of jury questionnaires is to elicit basic information, possible biases, and other problems that would otherwise be brought out during voir dire. Counsel may rely on these questionnaires to determine which questions to ask during voir dire and which jurors to strike, thus minimizing the length of voir dire.[18] The court of criminal appeals has noted that defense counsel is entitled to rely on the questions asked by the court and the prosecutor during voir dire.[19] Furthermore, the trial court and the attor-

neys can rely on information that is available only from the juror questionnaires or information cards.[20] It is well-settled law that counsel may strike prospective jurors based solely on their responses to the jury questionnaires.[21]

Our sister court of appeals in Dallas also addressed the issue of whether viewing juror questionnaires constitutes the beginning of voir dire in a non-capital case, holding that "the examination of the juror information cards was not tantamount to the commencement of voir dire. Consequently, the trial court erred in failing to grant appellant's timely motion to shuffle the jury panel." [22] It is fundamental that both the State and the defense have the right to look at the jury panel seated in order in the courtroom and that they have the right to listen to the venire's responses to questions posed by the trial judge before exercising the right to a shuffle.

Most existing case law deals with the defendant's right to a jury shuffle. The State's right under article 35.11, however, is no less compelling, nor is the trial judge's authority to conduct the affairs of the court expeditiously. I respectfully submit that the majority's reliance on *Davis*, which I reiterate deals only with the jury shuffle rule for capital cases under article 35.17, is misplaced. We are not dealing with the rules governing capital murder voir dire in the case now before us. Additionally, *Davis* does not address the question of whether a trial judge *may* allow the lawyers to review the juror questionnaires before requesting a shuffle. *Davis* addresses the question of whether a trial judge *must* allow the lawyers to review the juror questionnaires before requesting a shuffle.

---

**16.** Appellant does not complain of an improper shuffle in contravention of article 35.11.

**17.** See *Cuellar v. State*, 943 S.W.2d 487, 495 (Tex.App.—Corpus Christi 1996, pet. ref'd) (Yanez, J., concurring).

**18.** See *id.* at 495–96 (Yanez, J., concurring).

**19.** See *Armstrong v. State*, 897 S.W.2d 361, 364 n. 1 (Tex.Crim.App.1995).

**20.** See *Doby v. State*, 910 S.W.2d 79, 81 (Tex. App.—Corpus Christi 1995, pet. ref'd).

**21.** See *Cuestas v. State*, 933 S.W.2d 731, 733 (Tex.App.—Fort Worth 1996, no pet.) (holding that counsel's peremptory strike because venireperson was liberal was supported by record solely because venireperson admitted on his jury questionnaire that he was liberal).

**22.** *Holman v. State*, 636 S.W.2d 18, 18–19 (Tex. App.—Dallas 1982, pet. ref'd).

Moreover, the decision in *Davis* does not turn on the authority of the trial judge to permit examination of the questionnaires but, rather, on when voir dire in a capital case actually begins for the purpose of article 35.11. The court of criminal appeals did not hold, as does the majority in the case now before us, that voir dire had begun because the lawyers had reviewed the juror questionnaires. The court of criminal appeals held that the demand for a shuffle was untimely because the demand came after the trial judge had conducted the initial examination under article 35.17(2), which began voir dire.[23] The court of criminal appeals held that there is no absolute right to examine the juror information before the trial judge begins his remarks in a capital case.

I therefore would hold that the State's request for a jury shuffle was timely, because voir dire had not yet begun when the lawyers read the juror questionnaires. I would not intrude on the authority of the trial judge to determine how voir dire will be conducted and when the lawyers may examine the juror questionnaires. Because I believe the majority has misinterpreted the meaning of *Davis,* I respectfully dissent to its holding that the trial court erred by granting the State's motion to shuffle the venire. I would affirm the judgment of the trial court.

---

**23.** *See Davis,* 782 S.W.2d at 215.