# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00633-CR

**Moses Williams, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. D-1-DC-07-301086, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

A jury convicted Moses Williams of the offense of aggravated robbery. *See* Tex. Penal Code Ann. § 29.03 (West 2003). Punishment was assessed at 40 years' imprisonment. In a single point of error, Williams challenges the admissibility of pretrial identification testimony by the victim of the offense. We will affirm the judgment of conviction.

## BACKGROUND

The jury heard evidence that, at approximately 11:00 a.m. on May 8, 2007, two people, a man and a woman, robbed a convenience store in Austin. At the time of the robbery, Jan Mohammad was working at the store. Mohammad, who professes to understand only "some English," testified at trial through an interpreter concerning the incident. According to Mohammad, he was sitting at the register when two or three people came into the store and "started beating

me up."[1] Mohammad explained that one person, a woman, held him while another person, a man, beat him. According to Mohammad, the man hit him "seven, eight times" and, after Mohammad fell to the ground, started beating him again. Then, Mohammad testified, the man took the cash register and ran away.

Mohammad claimed that he saw the person who was beating him. When asked if he was able to "get a good look at that person," Mohammad testified, "Yes. He was a black man, and he was limping." Mohammad then identified Williams in court as the person who had attacked him. When asked how he recognized that person, Mohammad explained, "When he came inside my store, I saw him." The incident was recorded on the store video camera, and a copy of the recording was played for the jury.

Daniel Scott Horton, a frequent customer at the store, witnessed the robbery and testified at trial. Horton testified that when he entered the store, he observed two people behind the counter "stomping and attacking" Mohammad, who was on the ground at the time. Horton noticed that one of the people was using a weapon in the attack, "some sort of stick." Horton testified, "As soon as I realized that it was an armed robbery going on, that I was outnumbered, I ran out the door to get my cell phone and call 911." Horton described the robbers to the police as a black male of thin or medium build, "certainly not overweight," and a Hispanic male, although he could not be certain about the description of the second person. Horton testified that he was focused primarily on the black male—"the man with the stick in his hand." When Horton was later shown

---

[1] Mohammad initially testified that three people entered the store. However, after watching the store video recording of the incident, Mohammad clarified that only two people were involved and the third person "must be a customer."

2

a photo lineup consisting of black males, he was unable to identify the suspect. In Horton's words, "I just didn't get enough of a look." However, Horton testified that he was able to get a good look at the car that the robbers were driving. Horton explained that after he had retrieved his cell phone, he saw "this car basically peeling out." Horton described the car as a white Pontiac Grand Am or Grand Prix, "with the back window broken out."

David Guerra, another frequent store customer, testified that when he was driving by the store that day, he noticed a "car facing sideways" parked in front of the store. Guerra described the vehicle as "a white car" that "either looked like a Grand Am or Sunbird" with a "busted window in the back." Finding it unusual that the car was parked sideways, Guerra decided to pull into the parking lot and look inside the store to "see what was going on." Guerra testified that he saw "this man come out of the store limping on one leg real fast to the car," and then he saw a "lady come out, a female lady with the register in her hand, and I knew exactly what was going on." Guerra described the man as a thin, black male, and the woman as a "heavy-set Hispanic girl." In an attempt to prevent them from escaping, Guerra pulled up behind the car and started honking at the car and yelling. The car nevertheless "sped away." Guerra ran inside the store, observed Mohammad with "blood all over him," and encountered Horton. Horton advised Guerra that he had already called 911, and Guerra decided to try to pursue the robbers in his car. Guerra testified that he saw the car "about four stop signs ahead" of him, but could not catch up with it because it "just kept passing the stop signs."

When the police arrived at the crime scene, they recovered a wrench from the store counter. Officer Ryan Herring of the Austin Police Department testified that he believed the wrench

3

was "most likely the weapon used to assault Mr. Mohammad." When asked why he believed the wrench was the weapon used, Herring testified, "It has bloodstains on it, and then also from going back and . . . reviewing the video, this appears to be the size and shape of the object that could be seen on the video as being used by the suspect." Although usable fingerprints could not be retrieved from the wrench, it was subsequently analyzed for DNA. According to Cassie Carradine, the DNA Supervisor for the Austin Police Department, the DNA profile from the wrench was "consistent with a mixture, and Jan Mohammad and Moses Williams cannot be excluded as contributors to that mixture." Carradine testified that for Mohammad, this meant that "the probability of selecting an unrelated person at random who could be a contributor to that stain is approximately one in 1.929 trillion for Caucasians, one in 11.28 trillion for Blacks, and one in 705.7 billion for Hispanics." Carradine also testified that because Williams's DNA was more consistent with being a "minor component" of the mixture, the information on his alleged DNA stain was not as "robust." According to Carradine, "the probability of selecting an unrelated person at random who could be a contributor to that stain is approximately one in 175 for Caucasians, one in 13 for Blacks, and one in 48 for Hispanics."

On the same day that the robbery occurred, the suspect vehicle was reported as being involved in a collision. Police found the vehicle abandoned and impounded it. Inside the vehicle, police found a black UT baseball cap that, according to the testimony of one of the investigating officers, looked similar to the cap the male robber was wearing in the video. The vehicle was later identified as belonging to Lisa Duke.

4

On the following day, officers looked for possible vehicle matches in the department database. They came across a description of a vehicle that had been connected to a report of an aggravated assault two days earlier. Officer Charles Jackson of the Austin Police Department testified that on May 7, the day before the robbery, Williams's sister reported that her brother had been stabbed in the leg. When Jackson arrived at the location of the alleged stabbing, he observed "a white Pontiac two door" parked at the location. The vehicle had a "smashed out back window." According to Jackson, inside the vehicle were two men and a woman. Jackson testified that the occupants were identified as Williams, Lisa Duke, and Richard Salano.

The lead detective in the robbery investigation was Detective Ralph Tijerina of the Austin Police Department. Tijerina testified that when he was informed about the report of the aggravated assault, he decided to look for photographs of Williams and Duke in the database and compare them to the people that were seen on the video recording of the robbery. After doing so, Tijerina noted several similarities between Williams and the man in the video: "The fact that the race was correct, the height, weight and build is going to be pretty accurate. The hair color, the hair length . . . . On the photo, I remember that the male had a little bit of a goatee, on the video you could see that the male in that video also had a goatee." These similarities, Tijerina testified, made Williams a possible suspect in the crime.

Using the photograph of Williams and five other individuals "that match[ed] the description" of Williams, Tijerina prepared a photo lineup. He then went to the hospital where Mohammad was recovering from his injuries and showed him the lineup. Tijerina testified that Mohammad identified the person in photograph number five as the person who attacked him.

5

Photograph number five was the photograph of Williams.[2]  After leaving the hospital, Tijerina obtained an arrest warrant for Williams, who was arrested shortly thereafter.  After he was arrested, according to Tijerina, Williams admitted that he was with Duke the morning of the robbery and "broke up" with her at around the time the robbery occurred.  However, Williams denied being near the convenience store when the robbery occurred.

Several months later, Duke was apprehended in Abilene after having committed another robbery.  She agreed to testify for the State.  Duke testified that she and Williams smoked crack cocaine together.  According to Duke, on the day before the robbery, the back window of her car had been smashed and Williams—who she called "Squirrel"—had been stabbed in the leg during an altercation with another drug user.  In court, Duke identified Williams as the man who she knew as "Squirrel."  Duke testified that as a result of the stabbing, Williams "had to hop along on his right leg."  The next day, Duke continued, she and Williams decided to "just ride around" and rob "something" to get money to buy more crack cocaine.  In Duke's words, "We really didn't have a plan . . . .  It just flowed the way it flowed."  According to Duke, they decided to rob the convenience store because they noticed that there "was just an old man working inside" and, therefore, they had "a better chance of getting the money."

Duke explained that when they went inside the store, in an effort to "distract" Mohammad, she told him that she needed a band-aid or some cream for Williams's leg. Then, Duke testified, when Mohammad bent down to look at Williams's leg, "that is when Moses started hitting

---

[2]  We will further detail the circumstances surrounding this identification when discussing Williams's point of error.

6

him." Duke claimed that she "didn't know that was going to happen" and began trying to stop Williams from beating Mohammad, to no avail. Eventually, Duke testified, Williams grabbed the cash register and ran to the door. Duke followed him out. Before they exited, Williams handed the register to Duke, and she carried it to the car. In court, Duke identified the wrench that Williams allegedly used in the attack and the baseball cap that Williams allegedly wore during the robbery.

No witnesses testified for the defense. The jury convicted Williams of aggravated robbery, and he was sentenced to 40 years' imprisonment. This appeal followed.

## ISSUE PRESENTED

In his sole point of error, Williams asserts that the district court abused its discretion in denying his motion to suppress any evidence of Mohammad's identification of Williams. Williams claims that the pretrial identification procedure at the hospital was "unduly suggestive" and "gave rise to a substantial likelihood of misidentification." The State responds that the procedure was not suggestive and did not create a substantial likelihood of irreparable misidentification. The State adds that even if the district court abused its discretion in admitting the identification, the error was harmless.

## SCOPE AND STANDARD OF REVIEW

The *Guzman* standard of review applies to a trial court's ruling on a motion to suppress evidence based on a claim that an impermissibly suggestive pretrial identification procedure violated the defendant's due process rights. *See Loserth v. State*, 963 S.W.2d 770, 771 (Tex. Crim. App. 1998) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)); *Moore v. State*,

7

140 S.W.3d 720, 729-30 (Tex. App.—Austin 2004, pet. ref'd). Under the *Guzman* standard, almost total deference is afforded to the trial court's determination of the facts, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Moore*, 140 S.W.3d at 730. The same amount of deference is given to mixed questions of law and fact if the resolution of those ultimate questions turns on an examination of credibility and demeanor of the witnesses. *Id*. However, if mixed questions of law and fact do not relate to credibility and demeanor, then the trial court's determinations are reviewed de novo. *Id*.

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial photographic identification. *Luna v. State*, 268 S.W.3d 594, 605 (Tex. Crim. App. 2008) (citing *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999)). The test is whether, considering the totality of the circumstances, "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. The court of criminal appeals has held that this is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Loserth*, 963 S.W.2d at 773. Accordingly, we apply a de novo standard of review. *Id*.; *Moore*, 140 S.W.3d at 730.

This review involves a two-step analysis: (1) whether the out-of-court identification procedure was impermissibly suggestive; and, if so, (2) whether that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. *See Simmons v. United States*, 390 U.S. 377, 384 (1968); *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). If we reach the second step, we consider the following factors in determining whether an impermissibly

suggestive procedure gave rise to a substantial likelihood of irreparable misidentification: (1) the witness's opportunity to view appellant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of confrontation; and (5) the length of time between the offense and the confrontation. *Luna*, 268 S.W.3d at 605 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1972)).

When examining the above factors, courts are to focus on the reliability of the identification. "Reliability is the linchpin in determining the admissibility of identification testimony." *Id*. Thus, "the identification testimony will be admissible if the indicia of reliability outweigh the apparent corrupting effect of the unnecessarily suggestive pretrial occurrence." *Harris v. State*, 827 S.W.2d 949, 959 (Tex. Crim. App. 1992). "The burden is on the defendant to show by clear and convincing evidence that the in-court identification is unreliable." *Id*. This is a "heavy burden." *Id*. at 960.

## ANALYSIS

Williams argues that the pretrial identification procedure was unduly suggestive not because of any problems with the content of the photo lineup, but because of alleged translation difficulties during the administration of the lineup. The record reflects that Mohammad speaks the Urdu language, a Hindi dialect, and he has only a limited understanding of English. According to Williams, Mohammad "could not understand what the officer was saying in the hospital room" and "relied on his son to interpret for the officer and had no idea whether his son was accurately interpreting the officer's statements regarding the photo spread." Williams asserts that Mohammad's

9

son Asif told Mohammad "that the robber's picture was in the photo spread and that he was required to pick out one of the pictures."

The only two witnesses to testify at the suppression hearing were Mohammad and Detective Tijerina. Asif did not testify at the hearing or at the trial on the merits. Tijerina testified that he did not understand Mohammad's language, and, therefore, did not understand Asif's translation. The only testimony Mohammad provided concerning his son's translation is the following:

Q: Okay. When Officer Tijerina was questioning you, who was interpreting in the hospital?

A: My son was there.

Q: What is his name, sir?

A: Asif, A-S-I-F.

Q: Was anybody else in the room with you?

A: Which time?

Q: When Officer Tijerina was there?

A: My wife was also present.

Q: Do you have any daughters or anybody else there or not, any other family?

A: No.

Q: Did you discuss the photographic array with your son prior to making the identification?

A: My son interpreted for me what the officer was saying.

10

Q: Mr. Mohammad, you yourself did not understand what Officer Tijerina was saying?

A: No, I did not understand what he was saying.

. . . .

Q: You did not understand the questions asked to you in English without interpretation?

A: That is correct.

Q: Exactly what did your son say, if you recall?

A: Whatever the officer was telling him and he was interpreting for me.

Q: But you don't know for sure that your son was verbatim translating what the officer said, do you?

A: My son was interpreting for me.

Q: Is he a—an interpreter for the court or anything like that, your son?

A: No, no, he is a student.

There is nothing in the above testimony or anything else in the record to support Williams's assertion that Asif inaccurately translated what Tijerina said during the lineup. Thus, we shall focus our inquiry on the words and actions of Tijerina during the lineup.

Tijerina testified that when he arrived in Mohammad's hospital room, Mohammad "was sitting up in a chair, he was awake, seemed pretty coherent." Tijerina then provided the following testimony about the circumstances surrounding the lineup:

Q: What did you tell him about the photo lineup before you showed it to him?

11

A:      I told him that I was going to present him with a photo lineup that consisted of approximately six people and that the person that had committed the robbery may or may not be in the photo lineup. I also told him it was a photo array or lineup of male subjects.

Q:      And did you in any way tell him that he had to pick somebody out or he didn't have to? What did you tell him about that if he recognized somebody?

A:      I told him to take a look at the photos, to look at them carefully, and that if he recognized the person who committed the robbery, to point them out.

Q:      Did you give him any specific information about any specific person in the lineup?

A:      No, ma'am.

Q:      And when you were talking to him and communicating this to him, did it appear that he understood what you were saying?

A:      Yes, ma'am.

Q:      Did you give him the lineup?

A:      Yes, ma'am.

Q:      How were you seated? You said he was in a chair. Where were you?

A:      He was sitting in a chair, and I was right in front of him, maybe three, four feet, about three feet away.

Q:      Were you facing him or were you sitting the same direction looking at what he was looking at?

A:      I was facing him.

Q:      And when you gave him the photo lineup, what did he do with it?

A:      He looked it over, he studied it carefully, and then he nodded his head and he pointed at the lineup.

Q:      And when he first did that, could you tell what he was pointing to?

12

A:      I could tell he was pointing at the lineup, but I couldn't tell which individual he was pointing at.

Q:      Is that because of the way you were seated?

A:      The way I was standing, yes, ma'am.

Q:      And at that point after he looked at it and pointed to it, what did you do?

A:      I asked him if he recognized the person, and he said yes, and I asked him to point to which one.

Q:      And what did he say?

A:      He pointed to number five [the photo of Williams].

. . . .

Q:      And at any time when you were there when you were talking with him prior to showing him the lineup, did you tell his family which person in the lineup was the suspect that you had identified?

A:      No, ma'am.

Additionally, Tijerina testified that he repeatedly asked Mohammad if he understood what he was

telling him:

> When I asked him—when I told him that I had a photo lineup to present to him and asked him if he understood me, he nodded his head. When I told him that the person that had committed this robbery, the male person may or may not be in the photos, I asked him if he understood. He nodded his head. I told him to take a look at the photos carefully to—if he identified or recognized a person who had committed this, to let me know, and he nodded his head.

Nothing in the above testimony establishes by clear and convincing evidence that Tijerina

conducted the photo lineup in an impermissibly suggestive manner. *See, e.g.*, *Barley*, 906 S.W.2d

13

at 33 ("Suggestiveness may be created by the manner in which the pre-trial identification procedure is conducted, for example by police pointing out the suspect or suggesting that a suspect is included in the line-up or photo array.")

Mohammad's testimony, although less clear on the point than Tijerina's testimony, similarly does not establish by clear and convincing evidence that the procedure was impermissibly suggestive:

Q:     When you were shown the photo lineup, were you told anything by the police officer?

A:     He says which is the person who came to my place.

. . . .

Q:     Sir, was this the photo spread that you were shown by the police officer?

A:     Yes.

Q:     And did the police officer tell you who to pick?

A:     He showed me the photograph, then I told him which is the one.

Q:     And when you told him which is the one, why did you tell him which one?

A:     That is the person who came to my store.

Q:     Did the police officer in any way influence you in who you picked?

A:     I picked myself.

. . . .

[On cross]:

Q:     Mr. Mohammad, did Officer Tijerina instruct you that it is just as important to clear the innocent person from suspicion as to identify the guilty parties?

14

A: He asked me which is the person who attacked me.

Q: Okay. Did he—did he instruct you that the person who committed the crime may or may not be in the set of photographs presented to you?

A: He did not instruct me, no.

Q: Did he instruct you that the person—that one of the people in the photographic array was the person who committed the crime?

A: He told me these are the photographs he had to pick out one of the person [sic].

Q: Okay. So to clarify that, he told him he had to pick one of the persons in the photographic array, State's Exhibit No. 1?

A: No, he showed me the photographs, and I picked the person.

Q: Okay. Did the person you picked look exactly as the person who was in your store the day or so before?

A: It was the same person who was in the photograph and also came in my store.

Q: Was his appearance any different on the day in the hospital than he had been in the store?

A: He was the same.

At most, the above testimony suggests that Mohammad may have understood Tijerina to tell him that the suspect was in the lineup. That is not enough to render the lineup impermissibly suggestive. *See Harris*, 827 S.W.2d at 959 ("A lineup is not rendered unnecessarily suggestive simply because the complainant is told that it contains a suspect, because a complainant would normally assume that to be the case."); *Webb v. State*, 760 S.W.2d 263, 272 (Tex. Crim. App. 1988) (observing that if fact that witness "presupposes that police have some reason to believe one of the participants is the perpetrator" was "alone sufficient to render the lineup impermissibly suggestive, however,

15

precious few lineups would meet constitutional muster"); *Abney v. State*, 1 S.W.3d 271, 275 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("[I]t is well established that a pretrial identification procedure is not impermissibly suggestive merely because a witness may have believed one of the individuals in the photo array or lineup was a suspect.").

On this record, we conclude that Williams has failed to satisfy his burden to prove by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive. Therefore, we need not consider whether the procedure gave rise to a substantial likelihood of irreparable misidentification. *See Barley*, 906 S.W.2d at 34.

Alternatively, even assuming Mohammad's identification of Williams should not have been admitted, we could not conclude on this record that Williams was harmed by the admission of the evidence. An impermissibly suggestive pretrial identification procedure implicates a defendant's constitutional due process rights. *See Webb*, 760 S.W.2d at 269. Accordingly, if there had been error, we would be compelled to reverse unless we determined "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a). "If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (citing *Satterwhite v. Texas*, 486 U.S. 249, 256 (1988)). We ask whether there is a "reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Id*. In such a case, "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error." *Id*. Here, the finding in question is Williams's identity as the perpetrator of the offense.

16

Williams asserts that he was harmed because the "centerpiece of the State's prosecution" was Mohammad's identification, and Williams claims that Mohammad's identification "was repeatedly stressed in final argument before the jury." However, having reviewed the record in its entirety, including the closing arguments, we observe that the State did not appear to emphasize any one piece of evidence during its argument, including Mohammad's identification testimony. Instead, the State focused on all of the evidence in the case tending to show that Williams was the perpetrator of the offense. This evidence, which the State characterizes as "overwhelming," includes the following.

The day before the robbery, Williams was found in a "white Pontiac two door." There was evidence tending to show that this was the car that was used in the robbery, most notably the fact that it had its back window "smashed out" just like the car that eyewitnesses Horton and Guerra had observed at the store. When Williams was found in the car, he had been stabbed in the leg. The jury could have easily inferred that such an injury was consistent with both Guerra's testimony and the videotape showing that the robber walked with a limp. According to Detective Tijerina, when he compared the robber in the video to a photograph of Williams, he noticed several similarities: "The fact that the race was correct, the height, weight and build is going to be pretty accurate. The hair color, the hair length . . . . On the photo, I remember that the male had a little bit of a goatee, on the video you could see that the male in that video also had a goatee." Horton's description of the robber—a black male of thin or medium build, "certainly not overweight"—is also consistent with Williams's physical features. Also, a black UT baseball cap was found in the car that was used in the robbery. On the video, the male robber could be seen

17

wearing a similar cap. Furthermore, after Williams was arrested, although he denied being near the convenience store, he admitted that he had been with Lisa Duke around the time of the robbery. Moreover, according to the State's DNA expert, the probability of the DNA that was found on the wrench belonging to a black male other than Williams was one out of 13. That means, as the State emphasized during its closing argument, that 12 out of 13 black males could be excluded. Williams, however, could not be excluded as a contributor. Additionally, Lisa Duke, who admitted that she was the female robber, testified that Williams was the male robber. She testified in detail about the circumstances surrounding the robbery, including Williams's involvement in the crime, and her testimony was corroborated by the other evidence discussed above. On this record, we cannot conclude that there is a reasonable possibility that Mohammad's identification testimony moved the jury from a state of nonpersuasion to persuasion on the issue of Williams's identity. Accordingly, any error was harmless. *See Smith v. State*, 744 S.W.2d 86, 94 (Tex. Crim. App. 1987); *Livingston v. State*, 739 S.W.2d 311, 334 (Tex. Crim. App. 1987); *Williams v. State*, 477 S.W.2d 885, 888 (Tex. Crim. App. 1972).

We overrule Williams's sole point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   July 17, 2009

Do Not Publish

19